# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54241-2-II |
| Respondent, | |
| v. | |
| MARSHALL MARION WILSON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, A.C.J.—Daquan Foster and Marshall Marion Wilson got into a fistfight in a parking lot outside of a Tacoma nightclub. At least two people then fired shots that killed Foster and injured his wife, Olivia Brown. Foster's friend, Wyatt Percell, fled from the shots. Wilson and Randy Donaldson were charged with various crimes related to the incident, including Foster's murder, and they were tried together. The jury convicted Wilson of multiple counts but could not reach a verdict as to Donaldson.

Wilson appeals his convictions for second degree felony murder of Foster (count II), first degree assault of Brown (count III), second degree assault of Percell (count IV), and unlawful possession of a firearm (count V). He argues the prosecutor committed misconduct during closing argument by misstating the law on accomplice liability, asking the jury to hold Wilson accountable, and analogizing the reasonable doubt standard to a jigsaw puzzle. Wilson also argues that his trial counsel was ineffective for failing to object to the misconduct. Wilson contends insufficient evidence supported his convictions, the trial court improperly denied his motion to

sever his trial from Donaldson's, and he is entitled to resentencing under *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). Wilson also filed a statement of additional grounds for review.

We hold that the prosecutor committed prejudicial misconduct when he misstated the law on accomplice liability during closing arguments and that Wilson's trial counsel provided constitutionally ineffective assistance when she failed to object to these misstatements. Therefore, we reverse Wilson's convictions on the counts where the jury may have convicted based on an improper understanding of accomplice liability: second degree felony murder of Foster (count II), first degree assault of Brown (count III), and second degree assault of Percell (count IV). The State presented sufficient evidence to sustain all of Wilson's convictions, so it may retry Wilson on remand.

We affirm Wilson's conviction for unlawful possession of a firearm (count V) and remand for resentencing on this count under *Blake*. We do not reach Wilson's remaining arguments.

FACTS

I. BACKGROUND

On October 28, 2017, Wilson went to a bar in Tacoma called Latitude 84. He had been drinking during the day and continued to drink at the bar. Foster and Brown also went to Latitude 84 with some friends, including Percell.

After the bar closed, people exited into the parking lot. In the parking lot, Wilson and Foster began to argue. Brown and Percell tried to intervene. Wilson yelled at Foster and then punched him. Foster hit back and knocked Wilson to the ground. Someone else came up to the group and began shooting toward Foster. The State contends this shooter was Donaldson and that Wilson started shooting toward Foster either right before or right after Donaldson did.

Foster was shot seven times, and one bullet pierced his heart and lungs. He did not survive. Brown was shot in the hand. Percell fled and was uninjured. Although the State was able to determine that there were at least two guns involved in the shooting, a 9 mm handgun and a .40 caliber handgun, the State was unable to determine which gun fired the bullet that pierced Foster's heart and lungs.

The State charged both Donaldson and Wilson with intentional second degree murder of Foster (count I), alternatively with second degree felony murder of Foster "while committing or attempting to commit the felony crime of assault" (count II), first degree assault of Brown (count III), and second degree assault of Percell (count IV). Clerk's Papers (CP) at 439. Each of these counts also alleged that "the defendant, or an accomplice, was armed with a firearm." CP at 438-39. Donaldson and Wilson were tried together on these counts by a jury.

Additionally, the State charged both Donaldson and Wilson with one count of unlawful possession of a firearm (count V). This count was tried by bench trial, simultaneous to the jury trial.

## II. TRIAL

A.    <u>Witness Accounts of the Shooting</u>

When Brown spoke with police in the hours and days after the 2017 shooting, she told them that Wilson did not pull out a gun and that she did not see him with a gun. When she spoke with police at the hospital, Brown said there was one shooter, and she described him as having "[s]houlder-length dreadlocks, pulled back into a ponytail." 11 Verbatim Report of Proceedings (VRP) at 1655-56. On the night of the shooting, Donaldson had dreadlocks, and Wilson had short hair.

While at the hospital, Brown and several friends watched a video taken inside Latitude 84 on the night of the shooting and agreed that they could identify the shooter from the video. Donaldson was visible in the video, and Wilson was not. At trial, Brown testified that she recognized Donaldson in the video "[a]s the person who killed [her] husband." 10 VRP at 1517. "Based on the interview" she had with detectives on the night of the shooting, Brown believed "only one person had shot her husband." 15 VRP at 2424.

Percell also distinguished the person who fought with Foster from the person who shot Foster. He recalled that the man who initially fought with Foster had come within a few feet of them when another man came up and said, "Do we have a problem?" and pulled a gun out of the front of his pants. 11 VRP at 1682. Percell said the man with the gun had long, braided hair in a ponytail.

Another witness similarly testified that she saw a man "getting up to kind of defend himself" and then another man coming from across the street and starting to shoot. 12 VRP at 1804. Although she believed there was likely more than one shooter, she saw only one, and she remembered that he had "dreads." *Id.* at 1815. A fourth witness who had been in a parked car near the shooting saw Wilson "get knocked out" and then saw "somebody behind the car with shoulder-length braids, shooting." 14 VRP at 2227, 2230. A fifth witness testified that the shooter had braided dreadlocks "[a] little bit past his shoulders." 12 VRP at 1885. At trial, this witness specifically identified Donaldson as the shooter. She also said that as the shooting was happening, "another guy jumped on top of" her. *Id.* at 1882. After the shooting, this guy "stumbled off of [her] and went around the car." *Id.* at 1877.

4

During an interview in February 2019, Brown agreed that there were two shooters and identified Wilson as the second shooter, contrary to her statements on the night of the shooting. At trial, Brown testified that after Foster knocked Wilson to the ground, Wilson was "reaching" toward the "back of his pants," like he was "trying to pull something out of his back, but he was kind of hesitant." 10 VRP at 1497. Then "his friend showed up and started shooting." *Id.* at 1498. Brown identified Donaldson as this "friend." *Id.* She testified that "[r]ight after Donaldson started shooting," Wilson "pulled out his gun and started shooting." *Id.* at 1500.

Kristina Rios also identified Wilson as a shooter on the night of the incident. Rios knew Wilson because she had been friends with Wilson's girlfriend. On the night of the shooting, police were called to Rios's home because she was "beyond hysterical." 9 VRP at 1442. She told the responding officer that she saw Wilson "shooting the individual that he had been arguing with." 10 VRP at 1595.

At trial, Rios testified, "I could not tell you who was shooting but I . . . [saw t]he action of the shooting . . . like pointing the gun." 9 VRP at 1425. She was in the parking lot and heard "commotion, like yelling" and saw "a scuffle." *Id.* at 1417-18. Then Rios "saw flashes" and heard "guns go off" as her sister-in-law pulled her to the ground. *Id.* at 1423. After the shooting, Wilson got in the same car as Rios. Rios said Wilson appeared intoxicated. Although she could not remember his "exact words," she recalled Wilson saying something similar to "I hope that wasn't my bullet that killed that dude . . . and then he passed out." *Id.* at 1442. Rios described herself as "pretty much a functioning alcoholic" at the time of the shooting and admitted that she "had more than one drink" on the night of the shooting. *Id.* at 1404-05. She also admitted to using methamphetamine that night.

5

Tamika Williams testified that she saw a person with a neck tattoo and short curly hair shoot. This description closely resembled Wilson.

The trial court also admitted surveillance videos from nearby businesses, but the footage was blurred and unclear. The trial court remarked that the footage was "not great," 19 VRP at 2983, and both defense counsel, as well as the trial court, referred to the figures within the videos as "blob[s]," *id.* at 2977, 2985, 3101. However, the State sought to identify Donaldson, Wilson, and several of the witnesses based on their clothing.

B.      Jury Instructions

The jury was instructed that a person is an accomplice "if, with knowledge that it will promote or facilitate the commission of the crime, he either: (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime." CP at 613. This instruction further defined "aid" as "all assistance whether given by words, acts, encouragement, support, or presence" and stated that "[a] person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime." *Id.* "However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice." *Id.*

Initially, the State proposed an additional instruction defining "knowledge." This instruction stated, "A person knows or acts knowingly or with knowledge with respect to a fact when he is aware of that fact." CP at 500. The proposed knowledge instruction also provided, "If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of

that fact." *Id.* The defense did not object to this instruction. However, it was not included in the trial court's final instructions to the jury.

Wilson, the State, and the trial court all agreed that omitting the "knowledge" definition from the jury's instructions was inadvertent. Wilson's counsel admitted that she did not object to the absence of this instruction because she "didn't realize" it was taken out when the parties agreed to try count V to the bench. 30 VRP at 3954.

The jury was instructed that to convict Wilson of second degree murder "as charged in Count II," it had to find that "Wilson or an accomplice committed or attempted to commit assault in the second degree" and "Wilson or an accomplice caused the death of Daquan Foster in the course of and in furtherance of such crime." CP at 622. To convict Wilson of the first degree assault of Brown, the jury had to find that "Wilson or an accomplice assaulted" her "with a firearm" and "acted with intent to inflict great bodily harm." CP at 627. To convict Wilson of the second degree assault of Percell, the jury had to find that "Wilson or an accomplice assaulted . . . Percell with a firearm." CP at 629.

Finally, the jury was instructed that for the special verdict, "the State must prove beyond a reasonable doubt that a defendant was armed with a firearm at the time of the commission of the crime." CP at 630. "If one participant to a crime is armed with a firearm, all accomplices to that participant are deemed to be so armed, even if only one firearm is involved." *Id.* "If you find a defendant guilty for any of Counts I through IV, you will then use the special verdict form for that respective count and fill in the blank with the answer 'yes' or 'no' according to the decision you reach." CP at 633. "If after full and fair consideration of the evidence you are not in agreement as to the answer, then do not fill in the blank for that question." *Id.*

7

C.    Closing Arguments

1.    State's closing

In closing argument, the prosecutor characterized Wilson as "drunk and a loud mouth" who "chose to say something" to Foster, initiating the fight that resulted in Foster's death. 23 VRP at 3696. The prosecutor organized his argument around repeated references to the beginning and ending of this fight. He opined, "Daquan Foster wasn't looking for trouble that night, but he found it. He found it in the form of Marshall Wilson, who started the fight, and he found it in the form of Randy Donaldson, who ended the fight." *Id.* He told the jury "the men who picked the fight with Daquan and the men who ended the fight with Daquan, they sit before you in this courtroom." *Id.* at 3697. He argued that Wilson shot first, with Donaldson shooting as everyone, including Foster, ran away. "This is a case about establishing who shot." *Id.* at 3698-99.

The prosecutor then addressed the accomplice liability standard in detail:

[I]t's important for you all to understand the law of accomplice liability. It's important for you all to understand why Mr. Donaldson and Mr. Wilson are responsible for the conduct of each other, even though there may not have been any formal agreements in advance. This was not a crime that happened with tremendous planning. It was a crime that happened in the heat of a moment. But when you understand the law of accomplice liability, you understand that they still remain responsible for what each other does.

Your jury instruction on accomplice liability talks about what it takes to be an accomplice, and it talks about the term aid. Any aid. When you knowingly aid another in the commission of a crime, even if there wasn't a verbalization, if you didn't say let's go get him, if you knowingly aid someone in the commission of a crime, you are an accomplice to that person and you are responsible for everything that person does.

And so when Marshall Wilson and Randy Donaldson independently decide to go after Daquan, when they have a shared mission, while it wasn't verbalized, when they each go after him, they are aiding each other. Everything that Marshall Wilson does is an aid to Randy Donaldson in Randy Donaldson's pursuit, and

8

everything that Randy Donaldson does is an aid to Marshall Wilson in Marshall Wilson's pursuit.

. . . [W]e don't know which round it was that pierced Mr. Foster's heart. But it doesn't matter, because these two were acting as an accomplice to each other. And so even though only one may have been responsible for, in fact, ending Mr. Foster's life, they are both responsible for the actions of each other.

*Id.* at 3699-700.

The prosecutor argued, "[T]here's only one person who went after [Foster] initially, and it's Marshall Wilson." *Id.* at 3728. But he emphasized evidence that Wilson and Donaldson were "good friends . . . because it speaks to what they would do for each other." *Id.* at 3729. "[T]hey have the type of friendship where they might come to defend each other." *Id.* at 3730.

2.     Wilson's closing

In his closing argument, Wilson's counsel emphasized the importance of eyewitness testimony and argued this case "is about identifying . . . who shot Mr. Foster." *Id.* at 3772. She also addressed the legal requirements of accomplice liability: "So what is an accomplice? An accomplice is somebody who, with knowledge -- which is a key aspect here . . . that he will either solicit, command, encourage or request another person to commit a crime, or he aids or agrees to aid another person in planning or committing the crime." *Id.* at 3775-76. She argued, "[Y]ou're going to have a really hard time putting your finger on the evidence that [Wilson] was an accomplice to anybody, much less to Mr. Donaldson." *Id.* at 3776. She told the jury that "[Wilson] and I have no clue who shot Mr. Foster. We have heard the . . . same evidence that you've heard, we've watched the same videos, and we don't feel like we're any closer to the truth . . . [Wilson] doesn't know who it is he's supposed to be an accomplice of." *Id.*

Counsel continued, "[W]hen you read this instruction [defining accomplice liability], it looks like there has to be some sort of communication . . . something between [Wilson] and somebody . . . for him to become an accomplice, and I think you're going to have a hard time finding it." *Id.* "Mere presence and knowledge of the criminal activity is not enough. Just because [Wilson] was standing there, in a location where a homicide takes place, does not make him an accomplice. It makes him having presence and maybe knowledge, although he doesn't recall anything." *Id.* at 3777.[1] Counsel also suggested that Wilson was the man who "fell on top of" one of the witnesses when the shooting began. *Id.* at 3782.

3.       State's rebuttal

In rebuttal, the prosecutor responded to Wilson's assessment of the law on accomplice liability:

> [I]t's important, when you go back and read that jury instruction, that you understand what accomplice liability is and what it is not. Do not make accomplice liability something more than it is. You will read that instruction, and you will find nothing in there that says these two have to have had some type of verbal agreement before it happened. What it says is that you're an accomplice if you knowingly aid someone in the commission of a crime, and aid means any act done to further that crime. They didn't have to verbalize it. When each of them sought to go after Daquan Foster, they had a shared mission, *whether or not they realized it or not*.

*Id.* at 3811-12 (emphasis added). Donaldson's counsel objected and said he believed that was a misstatement of the law. The trial court responded, "The law will be that which is provided to the jury in the Court's instructions on the law." *Id.* at 3812. But the jury's instructions did not include the instruction defining "knowledge."

---

[1] Wilson claimed he did not remember anything from the night of the shooting and posited it was either due to his post-traumatic stress disorder or the amount of alcohol he consumed.

The prosecutor proceeded, "These two men had a shared purpose, both, to go after [Foster]. And so when [Wilson] is going after [Foster], and [Donaldson] is going after [Foster], everything that [Donaldson] does supports [Wilson], and everything that [Wilson] does supports [Donaldson]." *Id.* The prosecutor argued Wilson and Donaldson were accomplices, not because of a verbal agreement, but because they were "at all times aiding each other in the commission of that crime." *Id.* "Simply because they both decided to attack someone, and they brought guns with them, . . . that's what makes them accomplices." *Id.*

The prosecutor also revisited the theme of starting and ending the fight, saying Foster "got gunned down because that man [Wilson] opened his mouth and went after [Foster], and that man [Donaldson] ran up and finished the job." *Id.* at 3813.

D.     Verdicts

The jury acquitted Wilson of intentional second degree murder (count I) and found him guilty of second degree felony murder, first degree assault, and second degree assault (counts II, III, and IV). It left all of the special verdict forms blank. The trial court found Wilson guilty of unlawful possession of a firearm (count V). The jury could not reach any verdict as to Donaldson.

III. MOTION FOR A NEW TRIAL

Wilson filed a motion for a new trial, alleging that "the jury was confused as to the meaning of accomplice liability and consequently entered erroneous guilty verdicts." CP at 716. Wilson argued the absence of the instruction defining "knowledge," "combined with the State's misstatement of the law, which informed the jurors that knowledge did *not* mean knowledge of the crime about to be committed, but simply knowledge that someone else was there and committing a crime, worked in tandem to thoroughly confuse the jury." CP at 734. He argued, based on

declarations from three of the jurors, that the jury "believed the fact that Mr. Wilson *knew* his friends were there and shooting was sufficient to render him an accomplice to the crime." CP at 735.[2]

Wilson also argued that "plain" prosecutorial misconduct occurred because the prosecutor misstated the law of accomplice liability in rebuttal. CP at 741. He contended there was no evidence of an agreement to fight Foster and there was "not even evidence that Mr. Wilson knew his friends were armed," so the jury must have reached its verdict because it was not instructed on the meaning of "knowledge" and was "exposed to a patently erroneous interpretation of the law of accomplice liability in the State's rebuttal argument." CP at 742.

At a hearing on the motion, Wilson argued the State failed to present "any evidence . . . that could give either one of these men knowledge that one or the other of them was going to commit a crime." 30 VRP at 3955. He emphasized the prosecutor's statement about Wilson and Donaldson having a shared mission, whether or not they realized it, which Donaldson objected to at trial. Counsel argued that a new trial was warranted based on this statement because the instruction defining "knowledge" encompasses awareness, yet the prosecutor essentially told the jury "it didn't matter if they were aware or not." *Id.* at 3956-57. Additionally, the trial court's response to Donaldson's objection was to refer the jury to its instructions, but the jury was not provided with the instruction defining "knowledge." "Mr. Wilson is not charged with hitting Mr. Foster, an assault charge. He's charged with murder. And so we're focusing on how there could

---

[2] Wilson attached these juror declarations to his motion but later conceded that they could not be considered because they inhered in the verdict.

have been awareness, as is required by accomplice liability, of Mr. Wilson that Mr. Donaldson or whoever was going to kill him." *Id.* at 3955.

The State conceded that its statement indicating Wilson and Donaldson could be accomplices without realizing it "could be misconstrued . . . as a misstatement of the law if looked at in isolation," but it argued that the law requires the court "to look at the arguments as a whole." *Id.* at 3969. The State contended that "when you read the record as a whole," the prosecutor was merely arguing that accomplice liability may exist without a verbalized agreement. *Id.* at 3968. The State disagreed that the prosecutor was "disregarding the knowledge component of accomplice liability or making the argument that knowledge isn't required." *Id.* at 3969.

The trial court denied Wilson's motion for a new trial. Wilson did not designate the order denying his motion for a new trial in his notice of appeal.

## IV. SENTENCING

The State requested an exceptional sentence above the standard range because otherwise Wilson's conviction for unlawful possession of a firearm would go unpunished. Wilson requested an exceptional sentence below the standard range, arguing that "the offense was principally committed by another person," he had "manifested sincere concern for a potential victim" by jumping on top of her during the shooting, and the jury was confused during its deliberations. CP at 871. The trial court rejected both requests, stating that "the entirety of the sentence that the Court is imposing in this matter meets the needs of justice and speaks to the level and the nature and the extent of the conduct in this matter." 31 VRP at 4030. It imposed a sentence at the top of the standard sentencing range for each of Wilson's four offenses. His total term of confinement was 520 months.

Wilson's offender score on the charges of second degree murder (count II), first degree assault (count IV), and unlawful possession of a firearm (count V) included 1 point for a juvenile conviction for unlawful possession of a controlled substance. Wilson's offender score for the second degree assault charge was 0. The State concedes that absent the juvenile conviction for controlled substance possession, Wilson's offender score would be 1 point less on counts II, IV, and V.

Wilson appeals his convictions and his sentence.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Wilson argues the prosecutor's arguments in closing about accomplice liability deprived him of his constitutional right to a fair trial. We agree.

"The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish prosecutorial misconduct, "the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial." *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We review the prosecutor's arguments "'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.'" *State v. Thierry*, 190 Wn. App. 680, 689, 360 P.3d 940 (2015) (quoting *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994)).

A.      Standard of Review

      1.      Impact of the unappealed order denying a new trial

As an initial matter, an appeal from a final judgment automatically "brings up for review" the trial court's ruling on a CrR 7.5 motion for a new trial. RAP 2.4(f)(5). RAP 2.4(f) is "designed to encourage appeals only from final judgment, and to eliminate the procedural trap" that occurs when a related order is rendered unreviewable despite appeal from the final judgment. ELIZABETH A. TURNER, 2A WASHINGTON PRACTICE: RULES PRACTICE RAP 2.4 author's cmts. (8th ed. 2021).

When the motion for a new trial includes allegations of prosecutorial misconduct, "the trial court applies the same standard as an appellate court reviewing such claims." *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). A defendant who raises prosecutorial misconduct in a motion for a new trial may raise additional allegations of misconduct on appeal. *See id.* at 52-53. In *McKenzie*, the defendant appealed both the final judgment and sentence *and* the trial court's order denying his motion for a new trial. *Id.* at 51. For the allegations of misconduct that were raised in McKenzie's motion for a new trial, the Washington Supreme Court applied the prosecutorial misconduct standards recited above and concluded that the trial court had not abused its discretion when it denied the motion for a new trial. *See id.* at 56-59. For the allegations that were raised for the first time on appeal, the court simply applied the prosecutorial misconduct standards. *See id.* at 59-60.

Here, Wilson filed a motion for a new trial under CrR 7.5(a), arguing that the jury misapplied the law due to prosecutorial misconduct and the failure to include a knowledge instruction. The trial court denied the motion, and Wilson did not designate this order in his notice

of appeal. Nor does he specifically argue on appeal that the trial court abused its discretion when it denied the motion for a new trial.

However, RAP 2.4(f) indicates that the order denying Wilson's CrR 7.5 motion for a new trial is incorporated into this appeal simply by operation of the rule. *See* TURNER, *supra*. As a result, we follow the analytical framework that the Supreme Court applied in *McKenzie*. We apply the prosecutorial misconduct standard to determine whether the trial court abused its discretion in denying Wilson's motion for a new trial, and we allow Wilson to raise new or additional claims of misconduct on appeal.

      2.      <u>Impact of Donaldson's objection in closing</u>

There was only one objection to the prosecutor's articulation of accomplice liability in closing arguments—Donaldson's counsel objected during rebuttal after the prosecutor said, "When each of them sought to go after [Foster], they had a shared mission, whether or not they realized it." 23 VRP at 3812.

RAP 2.5(a) and cases interpreting it have allowed one defendant, when appealing, to rely on an objection made by their co-defendant below. *See* RAP 2.5(a) ("A party may raise a claim of error which was not raised by the party in the trial court if another party on the same side of the case has raised the claim of error in the trial court."). Additionally, a failure to object to every improper statement may not be necessary to preserve a claim of misconduct where the improper statements are all related to the same underlying issue. *See State v. Allen*, 182 Wn.2d 364, 375-78, 341 P.3d 268 (2015) (applying the lower prejudice standard of "whether there was a substantial likelihood that the misconduct affected the jury verdict" where the prosecutor misstated the law

on accomplice liability "at least five times" and the trial court "twice overruled [the defendant's] timely objections").

Here, consistent with RAP 2.5(a), Wilson may rely on Donaldson's objection on appeal. Moreover, we recognize that the statement objected to here—a statement during rebuttal that a defendant could be guilty as an accomplice "whether or not they realized" that they were on a "shared mission" to "go after" the victim—was the culmination of a pervasive, underlying theme in the prosecutor's arguments. 23 VRP at 3812. We determine the prejudicial effect of a prosecutor's statements in "'the context of the total argument.'" *Thierry*, 190 Wn. App. at 689 (quoting *Russell*, 125 Wn.2d at 85).

B.      Improper Conduct

        1.      Accomplice liability

A prosecutor commits misconduct when they misstate the law. *Allen*, 182 Wn.2d at 373; *State v. Jones*, 13 Wn. App. 2d 386, 403, 463 P.3d 738 (2020). "A person is an accomplice of another person in the commission of a crime if . . . [w]ith knowledge that it will promote or facilitate the commission of the crime," that person "[s]olicits, commands, encourages, or requests such other person to commit" the crime or "[a]ids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a). A person may act "with knowledge" under Washington law when they are "aware of a fact, facts, or circumstances," RCW 9A.08.010(1)(b)(i), or when they have "information which would lead a reasonable person in the same situation to believe that facts exist," RCW 9A.08.010(1)(b)(ii).

Under Washington's accomplice liability statute, however, the State must prove that the defendant "*actually* knew that [they were] promoting or facilitating [the principal] in the

17

commission of [the charged crime]," not just that the defendant had information which would lead a reasonable person in the same situation to believe they were promoting or facilitating the crime. *Allen*, 182 Wn.2d at 374. The statute defining "knowledge" "must be interpreted as only permitting, rather than directing, the jury to find that the defendant had knowledge if it finds that the ordinary person would have had knowledge under the circumstances." *State v. Shipp*, 93 Wn.2d 510, 516, 610 P.2d 1322 (1980). The State may prove actual knowledge through circumstantial evidence, but for a conviction to "pass constitutional muster, the jury must find actual knowledge." *Allen*, 182 Wn.2d at 374. "'[S]hould have known'" is not sufficient. *Id.* at 375.

The statutory language also requires "that the putative accomplice must have acted with knowledge that [their] conduct would promote or facilitate *the* crime for which [they are] eventually charged." *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). In *State v. Roberts*, the Supreme Court rejected jury instructions allowing a defendant to be found guilty as an accomplice if they were accountable for the conduct of another person "'in the commission of *a crime*.'" 142 Wn.2d 471, 510, 14 P.3d 713 (2000). The court interpreted this as an imposition of strict liability where the legislature "intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has 'knowledge.'" *Id.* at 511. A defendant may be guilty as an accomplice to a specific crime committed by a principal if they have "general knowledge of that specific crime," but the defendant is not liable "for any and all crimes" that may follow. *Id.* at 512; *see also State v. Grendahl*, 110 Wn. App. 905, 911, 43 P.3d 76 (2002) (reversing where the jury found the defendant guilty of robbery as an accomplice but may have believed the defendant "merely intended that [the principal] commit a theft").

2.      Prosecutor's arguments misstated the law

The prosecutor misstated the law of accomplice liability in both his initial closing argument and his rebuttal. A person cannot be guilty as an accomplice unless they have *actual* knowledge that their conduct is promoting or facilitating *the* charged crime. Here, the charged crimes were felony murder and first and second degree assault with a firearm, each against a different victim.

The most obvious misstatement was the one objected to—that "[w]hen each of them sought to go after" Foster, Wilson and Donaldson had "a shared mission, *whether or not they realized it*." 23 VRP at 3812 (emphasis added). A person cannot have knowledge that they are facilitating another's crime, as required for accomplice liability, and also not realize that they are facilitating the crime.

Although this was the most obvious misstatement, the prosecutor made other similar statements that inaccurately described the law. During his initial closing argument, the prosecutor described the altercation as happening "in the heat of a moment" with each defendant "independently decid[ing] to go after" Foster. *Id.* at 3699-700. He suggested that when Wilson and Donaldson "independently decide[d] to go after" Foster, they had a "shared mission," simply because they went after the same person. *Id.* at 3700. He made this insinuation more directly during his rebuttal argument. *See id.* at 3812 ("Simply because they both decided to attack someone, and they brought guns with them, and that's what makes them accomplices."). The vague nature of the words "go after" was particularly problematic in this case because "go after" could have referred to Wilson's decision to *punch* Foster, rather than a decision to shoot him. Wilson cannot be guilty of murder simply because the person whom he punched was later shot. To find Wilson guilty as

19

an accomplice, the jury was required to find that Wilson *knew* he was facilitating or promoting the shooting.

Additionally, the prosecutor referred to "knowingly aid[ing] another in the commission of a crime," rather than "the crime" or "the charged crimes," before stating that each defendant was responsible for "everything" that the other defendant did. *Id.* at 3699. He recited the law of accomplice liability as, "if you knowingly aid someone in the commission of *a crime*, you are an accomplice to that person and you are responsible for *everything* that person does." *Id.* (emphasis added). He further argued, "*Everything* that [Wilson] does is an aid to [Donaldson] in [Donaldson]'s pursuit, and *everything* that [Donaldson] does is an aid to [Wilson] in [Wilson]'s pursuit." *Id.* at 3700 (emphasis added). And again in rebuttal, after Donaldson's objection, he said they had "a shared purpose . . . to go after" Foster, "so when [Wilson] is going after [Foster], and [Donaldson] is going after [Foster], *everything* that [Donaldson] does supports [Wilson], and *everything* that [Wilson] does supports [Donaldson]. They are at all times aiding each other in the commission of that crime, and that's what makes them accomplices." *Id.* at 3812 (emphasis added). This could have led the jury to believe that Wilson was responsible for everything Donaldson (or another person) did to support Wilson *in his fistfight* against Foster, including shooting Foster, just because Wilson decided to "go after" Foster and initiate a fight. This was exacerbated by argument that Wilson "started" the fight and Donaldson "ended" it. *Id.* at 3696; *see also id.* at 3813 (arguing Wilson "opened his mouth and went after" Foster and Donaldson "ran up and finished the job").

This argument was contrary to both *Roberts* and *Grendahl*. One can knowingly aid in a theft without necessarily being responsible for the principal's decision to commit a robbery against the same victim. *Grendahl*, 110 Wn. App. at 911. And one can knowingly commit assault with

20

their hands without necessarily being responsible for another's decision to commit assault with a firearm against the same victim. By referring to "a crime" in a case that introduced evidence of an uncharged assault, relying on a theory that there was an unspoken "shared mission" to "go after" Foster, and repeatedly arguing that Wilson and Donaldson were each "responsible for everything" that the other did, the prosecutor mischaracterized the law of accomplice liability. *See, e.g.*, 23 VRP at 3699-700. He failed to carefully explain that an accomplice must have actual knowledge that their actions are promoting or facilitating the charged crimes—here, the murder of Foster, the first degree assault of Brown, and the second degree assault of Percell. We therefore hold that the prosecutor misstated the law, and the trial court abused its discretion when it denied Wilson's motion for a new trial.

C.      Prejudice

   1.      Factors indicating prejudice

Once the defendant shows that the prosecutor misstated the law, we must consider whether the misstatements were prejudicial. Where the defendant objected to the misstatement at trial, then we consider whether it "had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. Where there was no objection, we consider whether the misstatement "was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. Where there were multiple similar misstatements of the law, the Supreme Court has not necessarily required a separate objection to each one and instead has considered the cumulative effect of the misstatements. *See Allen*, 182 Wn.2d at 375-78.

In *Allen*, a unanimous Supreme Court reversed based on the prosecutor's misstatements of the law on accomplice liability. *Id.* at 387. It relied on four factors to conclude that there was a

substantial likelihood the prosecutor's misconduct affected the jury's verdict. *Id.* at 380. First, the court acknowledged that accomplice liability was a "key issue" in the petitioner's case. *Id.* at 375. Where the charges are based on accomplice liability, what the defendant "knew and did not know [is] critically important." *Id.* And where the State presents no direct evidence of actual knowledge, the trial outcome turns on whether the State presented sufficient circumstantial evidence to support an inference of actual knowledge, so a misstatement of the law on this issue may be "particularly likely to affect the jury's verdict." *Id.*

Second, the prosecutor in *Allen* misstated the law of accomplice liability multiple times. *Id.* at 376. "Repetitive misconduct can have a 'cumulative effect.'" *Id.* (internal quotation marks omitted) (quoting *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) (plurality opinion)). Although the prosecutor in *Allen* initially stated the law correctly, this was not sufficient to overcome the prejudicial effect of his multiple, subsequent misstatements. *Id.* at 377-78. The prosecutor repeatedly incorrectly stated that the petitioner could be found guilty if a reasonable person in his situation would have known, or should have known, that his accomplice would commit the charged crime—even if the petitioner himself did not actually know. *Id.* at 376-77.

Third, the trial court in *Allen* overruled the petitioner's objections in front of the jury, "potentially leading the jury to believe that the 'should have known' standard was a proper interpretation of law." *Id.* at 378. To support this factor, the Supreme Court cited to its earlier opinion in *Cronin*, where it reversed and remanded for a new trial because the jury instruction defining "accomplice liability" was deficient and it was "simply not clear" whether "the trial court's effort to clarify the incorrect instructions mitigated the harmful effect." 142 Wn.2d at 581.

Fourth, the record in *Allen* "reveal[ed] that the jury was influenced by the improper statement of law." 182 Wn.2d at 378. The jury had asked during deliberations "'[i]f someone "should have known" does that make them an accomplice?'" *Id.* The State argued that the jury's instructions clarified that "'[a] person knows or acts knowingly or with knowledge with respect to a fact or circumstance when he or she is aware of that fact or circumstance,'" and "'[i]f a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.'" *Id.* at 379. But the Supreme Court rejected the State's argument that the instructions cured any prejudice and concluded the record rebutted the presumption that juries follow instructions. *Id.* at 380.

Trial courts are not constitutionally required to instruct juries on the meaning of "knowledge" because Washington's statutory definition "merely reiterates the word's plain meaning." *State v. Scott*, 110 Wn.2d 682, 691, 757 P.2d 492 (1988). However, it is recommended that trial courts still define "knowledge" for certain offenses, including complicity offenses. *Id.* at 692. And we review the prosecutor's arguments "'in the context of . . . the instructions given.'" *Thierry*, 190 Wn. App. at 689 (quoting *Russell*, 125 Wn.2d at 85-86).

Finally, the Supreme Court in *Allen* noted that because "'[t]he jury knows that the prosecutor is an officer of the State,'" a prosecutorial misstatement of the law can be particularly likely to mislead the jury on critical issues. 180 Wn.2d at 380 (alteration in original) (quoting *State v. Warren*, 165 Wn.2d 17, 27, 195 P.3d 940 (2008)).

2. Factors supporting prejudice in Wilson's case

Here, there was an objection to the most egregious misstatement: "When each of them sought to go after [Foster], they had a shared mission, *whether or not they realized it.*" 23 VRP at 3812 (emphasis added). The trial court responded to the objection by saying, "The law will be that which is provided to the jury in the Court's instructions on the law." *Id.* The jury's instructions did not include the "knowledge" definition. There were no objections to other similar misstatements of the law, including references to an unspoken "shared mission" to "go after" Foster with intent to commit "*a* crime," but these statements were related to the prosecutor's overall argument on accomplice liability. *E.g.*, *id.* at 3699-700 (emphasis added).

As in *Allen*, the circumstances of this case indicate a substantial probability that the prosecutor's misstatements affected the jury's verdict. First, the misstatements in this case were particularly prejudicial because accomplice liability was a "key issue." *Allen*, 182 Wn.2d at 375. The parties agreed that this case turned on conflicting eyewitness testimony about who fired a gun. Because the State could not definitively identify who fired the shots that killed Foster and injured Brown, and because there was some evidence indicating that Wilson was not a shooter, accomplice liability was central to the State's case.

Second, the prosecutor's misstatements of the law on accomplice liability were repetitive. Statements minimizing the actual knowledge requirement permeated both the initial closing argument and the rebuttal. In the State's initial closing argument, the prosecutor portrayed Wilson as the one "who started the fight" and Donaldson as the one "who ended the fight." 23 VRP at 3696. The prosecutor argued, "It was a crime that happened *in the heat of a moment*. But when you understand the law of accomplice liability, you understand that *they still remain responsible*

*for what each other does.*" *Id.* at 3699 (emphasis added). In reviewing the evidence, the prosecutor highlighted that Wilson "went after" Foster first and emphasized evidence that Wilson and Donaldson were good friends "because it speaks to what they would do for each other." *Id.* at 3728-29. "[T]hey have the type of friendship where *they might come to defend each other.*" *Id.* at 3730 (emphasis added). Although the prosecutor spent some of his rebuttal time arguing that Wilson was one of the shooters, he also characterized Wilson as the man who "opened his mouth and went after" Foster and Donaldson as the man who "ran up and finished the job." *Id.* at 3813. The prosecutor's repetition of similar statements throughout both arguments likely had a cumulatively prejudicial effect on the jury's understanding of the law, potentially leading them to believe Wilson could be guilty as an accomplice even if he merely started the fistfight and did not know that someone else would shoot. *See Allen*, 182 Wn.2d at 376-77.

Third, the prosecutor's misstatements went uncorrected. When Donaldson objected to the argument that "[w]hen each of them sought to *go after* [Foster], they had *a shared mission*, *whether or not they realized it*," the trial court responded by referring the jury to its instructions. 23 VRP at 3812 (emphasis added). Although the instructions correctly defined "accomplice liability," the instruction defining "knowledge" was inadvertently omitted. Therefore, like in *Cronin*, it is unclear whether the trial court's curative instruction actually addressed the resulting prejudice.

Moreover, any resulting confusion was likely compounded by the fact that the prosecutor proceeded with the same theme after the objection. He continued, "These two men had *a shared purpose, both, to go after [Foster]*. And so when [Wilson] is going after [Foster], and [Donaldson] is going after [Foster], everything that [Donaldson] does supports [Wilson], and everything that [Wilson] does supports [Donaldson]." *Id.* (emphasis added). Neither the court's curative

instruction, nor the jury's instructions, nor the prosecutor's subsequent argument corrected the most egregious misstatement. And because this misstatement occurred during rebuttal, there was no opportunity for defense counsel to respond through argument. Instead, this was one of the last statements the jury heard before beginning its deliberations.

Fourth, the record indicates that the jury may have been influenced by these misstatements. Unlike in *Allen*, the jury did not ask for clarification on the definition of "accomplice liability" during its deliberations. Wilson submitted juror declarations, but we do not consider the declarations because they inhere in the verdict. Nevertheless, due to the nature of the prosecutor's arguments and the specific evidence presented in this case, there is an intolerable risk that the jury convicted Wilson without finding actual knowledge. It was undisputed that Wilson punched Foster and thus started the fight. The jury may have recognized Wilson's punch as a crime. Therefore, as discussed above, they may have understood the prosecutor's arguments to mean that Wilson's involvement in the physical assault against Foster rendered him automatically responsible for any subsequent, more serious crimes against Foster and his loved ones, especially because the prosecutor argued using the phrase "a crime" rather than "the crime." But a conviction under an accomplice liability theory "cannot stand" absent a finding that the accomplice had actual knowledge that the principal would commit the charged crime. *Allen*, 182 Wn.2d at 379. And unlike the jury in *Allen*, the jury here did not benefit from an instruction defining "knowledge." *See id.* Given all of these factors, we conclude there is a substantial likelihood the prosecutor's misstatements affected the jury's verdict.

Even if we separately consider the misstatements that were not objected to, the State committed flagrant and ill-intentioned misconduct when it repeatedly referenced a "shared

mission" to "go after" Foster, insisted that Donaldson and Wilson each shared liability for *everything* the other did, and argued that Wilson started the fight based on evidence of an uncharged assault. This repetitive misconduct—by an officer of the State—was particularly likely to confuse the jury and prejudice Wilson. *See Allen*, 182 Wn.2d at 380. And the resulting prejudice was unlikely to be cured by an objection, as demonstrated by the response to Donaldson's objection. The trial court's curative instruction merely referred the jury to instructions that did not define "knowledge." We consider "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.'" *Thierry*, 190 Wn. App. at 689 (quoting *Russell*, 125 Wn.2d at 85-86).

The State relies on the fact that both Donaldson and Wilson were "alleged to be shooters" to argue that they "would have had to have known that they were aiding each other" because they were shooting right next to one another. Br. of Resp't at 14. It is true that two shooters who were shooting simultaneously at the same target could be accomplices under the State's unspoken "shared mission" theory. But this ignores that the evidence was at best mixed as to whether Wilson *was* a shooter. The eyewitness testimony was contradictory, and the surveillance video evidence was difficult to decipher. The State's argument on appeal also ignores that the prosecutor argued at the beginning of his closing that Wilson shot first, undercutting any argument that he would have been aiding Donaldson. The jury's inability to unanimously agree that Wilson possessed a firearm for purposes of the special verdict also lends credence to the possibility that the jury found Wilson did not fire a gun and convicted him as an accomplice. Ultimately, we do not know whether the jury found Wilson guilty as a principal or as an accomplice. We therefore must reverse

Wilson's convictions for the felony murder of Foster (count II), first degree assault of Brown (count III), and second degree assault of Percell (count IV).

## II. ASSISTANCE OF COUNSEL

Wilson next argues that even if the prosecutor's misconduct were not sufficiently prejudicial to warrant reversal, we should nevertheless reverse because his trial counsel provided constitutionally ineffective assistance when she failed to object to the misconduct. We agree.

Effective assistance of counsel is guaranteed under both the federal and state constitutions. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22; *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prove ineffective assistance, a defendant must show that (1) their counsel's performance was so deficient it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced them. *Estes*, 188 Wn.2d at 457-58.

"Defense counsel's failure to object to a prosecutor's closing argument will generally not constitute deficient performance because lawyers 'do not commonly object during closing argument absent egregious misstatements.'" *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004)), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). However, the failure to object may be deficient performance if the prosecutor's remarks were both improper and prejudicial. *Id.* Defense counsel's deficient performance is prejudicial if there is a reasonable probability that absent counsel's deficiency, the outcome of the trial would have been different. *Estes*, 188 Wn.2d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

Because the prosecutor's misstatements of the law on accomplice liability were both improper and prejudicial, we conclude Wilson's counsel's failure to object was constitutionally deficient performance. *See Cross*, 180 Wn.2d at 721. And even if we were to conclude that the prosecutor's misstatements were not sufficiently prejudicial to warrant reversal under a prosecutorial misconduct analysis, defense counsel's failure to object undermines confidence in the outcome of the trial. The prosecutor's misstatements misled the jury about what was required to find accomplice liability, and defense counsel's failure to object and insist on clarity deprived the jury of a clear understanding of the law. An objection could have eliminated the distinct possibility that the jury would convict based only on a "shared mission" to "go after" Foster and knowledge of "*a* crime." 23 VRP at 3699-700 (emphasis added). In other words, it could have prevented the jury from convicting Wilson for the shootings if the jury believed Wilson only "went after" Foster by throwing the first punch. There is a reasonable probability that defense counsel's failure affected the outcome of Wilson's trial. Thus, the failure to object was constitutionally ineffective assistance.

## III. SUFFICIENCY OF THE EVIDENCE

Wilson contends the jury found him guilty of felony murder, first degree assault, and second degree assault as an accomplice and the State presented insufficient evidence to prove accomplice liability. Wilson claims the jury found him guilty as an accomplice because this is the only way to reconcile the general verdicts that Wilson was guilty of murder and assault with a firearm beyond a reasonable doubt with the special verdicts that he was not armed with a firearm beyond a reasonable doubt. Wilson then argues that the State failed to prove he "(1) knew another person was about to shoot, and (2) aided that person in some way." Br. of Appellant at 57 (citing

RCW 9A.08.020(3)(a) and *Roberts*, 142 Wn.2d at 511-12). We reject Wilson's contention that we must reconcile the general and special verdicts before conducting a sufficiency analysis and hold that sufficient evidence supported his convictions, permitting a new trial on remand.

Under the *Dunn*[3] rule, a criminal defendant cannot attack a guilty verdict on one count by relying on an acquittal on another count. *State v. Ng*, 110 Wn.2d 32, 46-48, 750 P.2d 632 (1988). "[W]hile truly inconsistent verdicts reveal that the jury somehow erred in applying the jury instructions, that error does not necessarily render the guilty verdict void, nor does it automatically establish prejudice. Juries return inconsistent verdicts for various reasons, including mistake, compromise, and lenity." *State v. Goins*, 151 Wn.2d 728, 733, 92 P.3d 181 (2004) (citations omitted). Any "individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *United States v. Powell*, 469 U.S. 57, 66, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984).

The Washington Supreme Court has held that where the jury returns a guilty verdict on a general charge and an apparently inconsistent special verdict, "[w]e should not second-guess the jury," so long as the evidence at trial is sufficient to support the guilty verdict. *Goins*, 151 Wn.2d at 730. An independent review of the sufficiency of the evidence offers "protection against jury irrationality or error." *Powell*, 469 U.S. at 67. "This review should not be confused with the problems caused by inconsistent verdicts." *Id.* When reviewing the sufficiency of the evidence, we ask "whether the evidence adduced at trial *could* support any rational determination of guilt[]

---

[3] *Dunn v. United States*, 284 U.S. 390, 393-94, 52 S. Ct. 189, 79 L. Ed. 356 (1932).

beyond a reasonable doubt," and this assessment "should be independent of the jury's determination that evidence on another count was insufficient." *Id.* (emphasis added).

When a defendant challenges the sufficiency of the evidence, they admit the truth of the State's evidence. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). We also draw all reasonable inferences from the evidence in the State's favor. *Id.* at 265-66. We ask whether "any rational trier of fact" could have found guilt beyond a reasonable doubt. *Id.* at 265. "'Credibility determinations are for the trier of fact' and are not subject to review." *Id.* at 266 (quoting *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

We first reject Wilson's contention that we must reconcile the general and special verdicts prior to assessing the sufficiency of the State's evidence to sustain the guilty verdicts. Wilson attempts to rely on two cases that indicate inconsistent verdicts must be reconciled where possible. *See* Br. of Appellant at 54 (citing *State v. Robinson*, 84 Wn.2d 42, 523 P.2d 1192 (1974), and *State v. Eker*, 40 Wn. App. 134, 697 P.2d 273 (1985)). However, these cases were decided prior to Washington's adoption of the *Dunn* rule. *See Ng*, 110 Wn.2d at 48. Thus, we limit our review to the sufficiency of the evidence to support the guilty verdicts for felony murder, first degree assault, and second degree assault.

Each of the to convict instructions for these counts stated that the jury could find Wilson guilty of the charged offense if it found that "Wilson *or* an accomplice" committed the charged crime. CP at 622, 627, 629 (emphasis added). The State presented sufficient evidence from which a rational juror could find that Wilson was a principal. There were three eyewitnesses who testified that they saw Wilson shooting or with a gun at some point in time. Although Wilson challenged the credibility of each of these eyewitnesses at trial, he admits the truth of the State's evidence for

the purpose of challenging its sufficiency on appeal, and we do not review the jury's credibility determinations. We hold that sufficient evidence supported the jury's guilty verdicts.

## IV. RESENTENCING AFTER *BLAKE*

In a supplemental brief, Wilson argues he is entitled to resentencing on three counts, counts II, IV, and V, because a juvenile conviction for unlawful possession of a controlled substance was included in his offender score.[4] The State concedes that it is appropriate to remand for the trial court to correct Wilson's offender score on his judgment and sentence. However, the State argues that resentencing is only appropriate on one count, count V, because the corrected offender scores will not change the standard sentencing ranges for counts II and IV. Because we reverse Wilson's convictions on counts II and IV, we accept the State's concession and remand for resentencing on count V.

The Supreme Court recently held that former RCW 69.50.4013(1) (2017), Washington's strict liability drug possession statute, violated the due process clauses of the state and federal constitutions and was therefore void. *Blake*, 197 Wn.2d at 195. A prior conviction that is determined to be constitutionally invalid may not be included in an offender score. *State v. Ammons*, 105 Wn.2d 175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986). A conviction for unlawful possession of a controlled substance was included in Wilson's offender score for count V. Accordingly, we accept the State's concession and remand for resentencing on this count.

---

[4] The offender score was 0 on count III, so that count is unaffected.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

A.      Cumulative Error

Under the cumulative error doctrine, the defendant may be entitled to a new trial where "multiple errors combine to deny the defendant a fair trial." *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015). "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Wilson argues that the prosecutor's misstatements, his trial counsel's failure to object or to request additional jury instructions, and the removal of the "knowledge" definition from the trial court's jury instructions all combined to undermine confidence in the fairness of his trial. We reverse some of Wilson's convictions due to the prosecutor's misstatements, and we agree that this error, particularly when combined with trial counsel's failure to object or to request additional jury instructions, denied Wilson his right to a fair trial.

B.      Knowing Use of False Testimony

Wilson also argues the State should not have relied on Brown's or Williams's eyewitness testimony because it was contrary to the evidence shown on surveillance videos. A conviction obtained through the State's knowing use of false evidence is unconstitutional. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). To prevail on this claim, Wilson "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). Wilson has failed to show that the testimony was "actually false." *Id.* To support his argument, he relies on surveillance videos, but this video footage is grainy and difficult to review. It also offers only a limited view of the events

surrounding the shooting. Brown's and Williams's testimony is not necessarily false because it does not align with Wilson's interpretation of what was happening in the video footage.

C.    Insufficient Evidence

Finally, Wilson argues there was insufficient evidence to support any of his convictions, including count V for unlawful possession of a firearm.[5] This is distinct from Wilson's counsel's sufficiency argument because it does not assume that Wilson was convicted as an accomplice and it encompasses count V. Although there was evidence presented at trial supporting Wilson's claim that he did not shoot, there was also evidence presented at trial supporting the State's theory that Wilson was one of the shooters, including eyewitness testimony. The trier of fact could have found this testimony credible. The State presented sufficient evidence to support Wilson's convictions.

CONCLUSION

We hold that the prosecutor's misstatements of the law on accomplice liability constituted prejudicial misconduct and reverse Wilson's convictions for felony murder (count II), first degree assault (count III), and second degree assault (count IV). We also hold that Wilson's trial counsel was constitutionally ineffective for failing to object to these misstatements. The State presented sufficient evidence to support these convictions, so it may retry Wilson on remand. We affirm Wilson's conviction on count V but accept the State's concession and remand for resentencing on this count.

---

[5] With his statement of additional grounds for review, Wilson includes a very detailed diagram of the crime scene and argues that he could not have been a shooter. Wilson also attaches a letter of allocution, explaining that he was not armed on the night of the shooting and did not fire a gun.

No. 54241-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Worswick, J.

Veljacic, J.